[No. 25461. *En Banc.* April 17, 1935.]

THE STATE OF WASHINGTON, *on the Relation of J. D. Keck, as Executor, Appellant,* v. THE CITY OF SUNNYSIDE *et al., Respondents.*[1]

[1]Reported in 43 P. (2d) 621.

*Roberts, Swanson & Tunstall,* for appellant.

*E. N. Funk,* for respondents.

BLAKE, J.—The entire city of Sunnyside is within the boundaries of sub-district 7, of drainage improvement district No. 3, of Yakima county. December 16, 1921, the county commissioners, pursuant to §§ 31 and 32, chapter 130, Laws of 1917, p. 540 (Rem. Comp. Stat., §§ 4431, 4435), levied an assessment against the city of Sunnyside, in the sum of $50,540.56, as and for special benefits accruing to the city by reason of the improvement. The special benefits consisted of better drainage of streets and alleys and in facilitating the construction of a sewer system and providing an outlet therefor. The assessment was payable in fifteen annual installments, with interest.

At the time the assessment was made (and at all times since), the city was indebted in excess of the debt limitation imposed upon municipal corporations by § 6, article VIII, of the state constitution. The city, however, in compliance with § 35, chapter 130, Laws of 1917, p. 549 (Rem. Rev. Stat., § 4441, P. C. § 1945-88), levied taxes annually to meet the obligation, until 1930. Beginning with that year, the city has failed to provide for payment of installments due under the assessment, as required under that section of the act.

The plaintiff, a holder of bonds of the drainage district, which were issued to raise funds with which to make the improvement, brought this action to compel, by writ of mandate, the mayor and city council of Sunnyside to levy taxes in a sufficient amount to pay

the installments of the drainage district assessment against the city accruing in the years 1934 and 1935. From a judgment dismissing the action, plaintiff appeals.

The problem for solution presents two phases: (1) Is the special assessment a *debt* of the city of Sunnyside; and (2), if so, is it such a debt as is contemplated by § 6, article VIII, of the constitution?

The first phase of the question would seem too plain for argument. The assessment is made by law a general obligation of the city. It is not a lien on any specific property. It is payable only by the exercise of the city's general power of taxation. Chap. 130, Laws of 1917, § 35 (Rem. Rev. Stat., § 4441, P. C. § 1945-88). That it is a debt, is the very purpose of this action to establish.

But is it a debt which comes within the constitutional limitation? The fact that it is an involuntary, rather than a voluntary, obligation does not, of itself, remove the constitutional inhibition. *Lake County v. Rollins,* 130 U. S. 662, 9 S. Ct. 651; *Village of Kenmore v. Erie County,* 252 N. Y. 437, 169 N. E. 637; *Eaton v. Mimnaugh,* 43 Ore. 465, 73 Pac. 754; *People ex rel. Seeley v. May,* 9 Colo. 404, 12 Pac. 838; *Kerr v. State ex rel. Wimbish,* 33 Okla. 110, 124 Pac. 284; *Fiscal Court of Franklin County v. Commonwealth,* 139 Ky. 307, 117 S. W. 301; *Barnard & Co. v. Knox County,* 105 Mo. 382, 16 S. W. 917, 13 A. L. R. 244. In *Lake County v. Rollins, supra,* the court said:

"Neither can we assent to the position of the court below that there is, as to this case, a difference between indebtedness incurred by contracts of the county and that form of debt denominated 'compulsory obligations.' The compulsion was imposed by the legislature of the State, even if it can be said correctly that the compulsion was to incur debt; and the legislature could no more impose it than the county could volun-

tarily assume it, as against the disability of a constitutional prohibition.''

This court, however, has long been committed to the doctrine that obligations of municipalities incurred in the performance of duties made mandatory by the constitution, or such obligations as are necessary to maintain corporate existence, are not debts within the limitation of § 6, article VIII, of the constitution. *Rauch v. Chapman,* 16 Wash. 568, 48 Pac. 253, 58 Am. St. 52, 36 L. R. A. 407; *Duryee v. Friars,* 18 Wash. 55, 50 Pac. 583; *Farquharson v. Yeargin,* 24 Wash. 549, 64 Pac. 717; *Hull v. Ames,* 26 Wash. 272, 66 Pac. 391, 90 Am. St. 743; *Gladwin v. Ames,* 30 Wash. 608, 71 Pac. 189; *Pilling v. Everett,* 67 Wash. 109, 120 Pac. 873; *Patterson v. Edmonds,* 72 Wash. 88, 129 Pac. 895; *State ex rel. Taro v. Everett,* 101 Wash. 561, 172 Pac. 752; *McCarthy v. Kelso,* 129 Wash. 121, 223 Pac. 151; *Rummens v. Evans,* 168 Wash. 527, 13 P. (2d) 26.

 What may be considered obligations incurred in the performance of ''mandatory duties'' and what expenditures may be considered as ''necessary to corporate existence'' is not always easy to determine, as an examination of the cited cases will show. While the criterion by which the question is to be determined is clear, the character of the obligation depends, in a large measure, upon the circumstances under which it is incurred. For instance, in *Farquharson v. Yeargin, supra,* it was held that indebtedness incurred for the building of a court house did not fall under the constitutional limitation, because it appeared from the evidence that the town of Republic had been destroyed by fire, and, therefore, it was to be presumed that the erection of the building was necessary to house the government of Ferry county. The court there said:

''While, ordinarily, warrants issued in payment of money expended in building a court house would not

fall under the class of compulsory obligations, the conditions existing in Republic at the time of the erection of the court house were such as to bring the warrants for the erection of this particular court house within the rule laid down in *Rauch v. Chapman, supra,* because it may be fairly inferred that no other building could be had for the purpose owing to the destruction of the town by fire."

The same thought is expressed in *Patterson v. Edmonds, supra,* where the court had under consideration warrants issued in excess of the city's debt limit for the repair of streets. There the court said:

"It might be that if some part of a street should become dangerous so suddenly as to require immediate attention, it would justify the incurrence of an indebtedness to repair it as a work of necessity; but certainly the injury caused by all ordinary wear and tear, the necessity to repair which can be foreseen for a period of time preceding the point of danger, can be repaired at the cost of property benefited without resorting to this extraordinary remedy."

So, in the instant case, it is not inconceivable that the city of Sunnyside might have been confronted with conditions that would have made the construction of a sewer system imperative in order to protect the health of its inhabitants. In such case, any necessary indebtedness incurred would fall within the rule of *McCarthy v. Kelso, supra,* and would not fall under the ban of the constitutional limitation.

But there is no such necessity shown here. At most, the improvement was in the nature of a convenience to the city of Sunnyside, in that it facilitated the disposal of surface waters and sewage. But that is not sufficient to take the obligation out of the purview of the constitutional limitation. *Patterson v. Edmonds, supra; Robb v. Tacoma,* 175 Wash. 580, 28 P. (2d) 327, 91 A. L. R. 1010. What was said in the latter case is peculiarly pertinent here. Involved there was a bond

issue that had failed to receive approval of three-fifths of the electors voting on the proposed issue. It was sought, nevertheless, to sustain the issue on the ground that it was necessary for the protection of public health to construct certain sewers. Disposing of this argument, the court said:

"There is quite a difference between the issuance and enforcement of orders, generally, to abate a nuisance or to prevent the spread of a threatened epidemic, on the one hand, and, on the other, an order compelling a city to install a vast sewage system necessitating a bonded indebtedness of three million dollars.

"Furthermore, we do not think that an emergency, as contemplated by the statute and our decisions, is presented by the pleadings in this case. The condition complained of did not suddenly appear, but had been a recurring topic of discussion for a long time, as appears by the answer. . . . However opportune the time and conditions may be for such project, and however worthy the motives of the city may be, those are matters which can not affect or measure the power of the city or the extent to which it may go in the creation of general indebtedness. We are satisfied that no case of legal emergency is presented, and we therefore hold that the demurrer to the affirmative defense was properly sustained."

The assessment in the instant case, being an obligation which was not incurred under mandatory constitutional authority, and not being an obligation necessary to corporate existence, falls within the constitutional limitation of § 6, article VIII.

Judgment affirmed.

MILLARD, C. J., BEALS, TOLMAN, HOLCOMB, MAIN, MITCHELL, and STEINERT, JJ., concur.

GERAGHTY, J. (dissenting)—I regret that I am constrained by my view of the law applicable to this case to dissent from the prevailing opinion, concurred in by the rest of my associates. In order to properly pre-

sent my views, it will be necessary to refer to the record in more detail than is done in the majority opinion, at the expense of unduly lengthening my dissent.

This controversy arises out of proceedings initiated under chapter 130, Laws of 1917, p. 517 (Rem. Comp. Stat., § 4405 *et seq.*), providing for the construction, maintenance and extension of diking and drainage systems.

It was the purpose of this law to create districts for extensive drainage and diking systems, and it was contemplated that the districts so created might embrace within their territorial limits incorporated cities and towns. Districts of this character are municipal corporations. Under the act, the expense of the construction of the drainage and diking improvements contemplated was to be borne by the benefited property in the district, and the funds necessary therefor were to be found by the issuance of warrants or bonds, in the discretion of the county commissioners, who were to act for the districts in the initial steps of their organization and in making the improvements. The validity of the act in its general features has been repeatedly sustained by this court.

Proceeding under the act, the commissioners of Yakima county organized the district here involved—sub-district 7 of drainage improvement district No. 3, Yakima county. Plans were adopted for the construction of an extensive drainage system. Within the boundaries of the district was the respondent city of Sunnyside. After the cost of installing the system had been ascertained, the county commissioners prepared an assessment roll, in which the cost was apportioned upon the property in the district. Upon this roll there was assessed to the city of Sunnyside, for benefits accruing to it by reason of the drainage of its streets and alleys and the facilitating and making pos-

sible the construction of a sewer system, the sum of $30,540.56.

Rem. Comp. Stat., § 4431, provided:

"Whenever any system of improvement constructed under the provisions of this act will drain, protect or otherwise improve the whole or any part of any public road, roadbed or track thereof, or where any such system of improvement will furnish an outlet for or facilitate the construction or maintenance of any sewer system in any city or town, there shall be apportioned against the county in which any such state or county road outside of any incorporated city or town is located, or against the city or town in which any such public road is located, or against any such other road or part thereof so drained, protected or otherwise improved, or against the city or town for which an outlet for sewage will be furnished or wherein the construction or maintenance of a sewer system will be facilitated, the proper amount of the total sum to be apportioned. The board of county commissioners may pay such portion as they deem proper of the amount assessed against the county on account of the drainage, protection or improvement of the roads, out of the funds of the road district in which such drainage, protection or improvement is made. The amount assessed against the state shall be paid out of the appropriate fund of the state."

A notice of the making of the assessment roll was given in accordance with § 4435, and a time fixed at which objections would be heard. When the roll came on for hearing upon the day appointed, responsive to some objections, certain modifications of the assessments were made, and the roll, as thus made, confirmed by order of the county commissioners. The confirming order, among other things, recites that evidence was given by some of the protesting property owners to the effect that the benefits to the city of Sunnyside for the drainage of its streets and alleys and for furnishing sewer outlet facilities, were greater in proportion to

the city's assessments than the benefits to private property were in proportion to the assessment on that property. This view was concurred in by the street committee of the city council of Sunnyside and by the city attorney, who were present and reported that the mayor and council of the city, after fully considering the assessment roll, were themselves of the opinion that the benefits to the city were in excess of the amount charged against it. In the revision of the roll before its confirmation, the county commissioners increased the assessment upon the city to $50,540.56.

Subsequently, the city passed an ordinance providing for the acceptance, ratification and approval of the assessment. The ordinance also elected to have the assessment levied against the city payable in fifteen yearly installments in accordance with the option given by law, and directed that the amounts necessary for the annual installments of its assessments should be included in the annual budget of the city and certified as other general taxes, in accordance with the statute. The passage of this ordinance, of course, was not necessary to the legality of the assessment; its purpose being, manifestly, to express the city's satisfaction, as owner of assessed property, with the apportionment and to give direction to its administrative officers for the inclusion of the necessary sums in the annual city tax levies.

The order confirming the assessment roll was made December 16, 1921, and the city's ordinance was approved by the mayor on February 14, 1922. The city made the necessary levy to pay its annual installments on the assessment for the year 1922 and for each succeeding year up to and including 1929. In 1930, under pressure of the prevailing financial stress, the city repudiated its duty and failed to include in its tax levy the sum necessary to meet its annual install-

ment on the assessment, and this default continued for succeeding years.

This action was brought by the appellant, a holder of bonds of the drainage district, for an alternative writ of mandate requiring the city, its mayor and council, to make the necessary levy for the years 1934 and 1935.

It is contended by the respondent, and its contention is accepted by the majority opinion, that the assessment levied upon the city by the improvement district is a *debt* within the meaning of § 6, Art. VIII of the state constitution, and that, as the respondent city was, at the time the assessment was levied, indebted in excess of the limit allowed without a vote of the people, the assessment is void. The appellant contends that the assessment imposed upon the city by the drainage improvement district is not a debt within the constitutional meaning, but a local improvement assessment levied upon it by the drainage district, a superimposed municipal corporation acting in pursuance of the constitution and statutes of the state; that the debt limited by the constitution is one voluntarily assumed, and not a financial burden imposed by a superior authority acting within the scope of its powers. The appellant contends further that the annual installments of the assessment are not debts, since they are provided for by annual tax levies to meet them as they accrue.

The levying of an assessment for special benefits by one municipal corporation upon the property of another is not a new procedure in this state. In *In re Howard Avenue North*, 44 Wash. 62, 86 Pac. 1117, 120 Am. St. 973, where the city of Seattle levied an assessment upon the property of the Seattle school district, the court held the assessment valid, in the absence of any express intent of the legislature to

exempt it from assessment, and although the school district was not, in express terms, directed to be assessed. And it was held also that the express constitutional exemption of school district property from taxation did not prohibit a special assessment to the extent of benefits from local improvements. No question arose in that case as to the debt limit of the school district, but I venture to say that, if the objection interposed to the present assessment had been urged there, it would not have received serious consideration. It is true that, in that case, the assessment was levied on specific school property, while in this, the assessment is directly levied against the city. But the result is the same, because governmental property can not be sold either for general taxes or special assessments. Special assessments levied upon them must be paid out of the general funds of the municipality, and taxes levied when necessary.

*In re Howard Avenue North, supra,* quotes with approval the following from *Edwards & Walsh Const. Co. v. Jasper County,* 117 Iowa 365, 90 N. W. 1006, 94 Am. St. 301:

"While authority to levy such assessments is traceable to the taxing power, they are nevertheless assessed on the theory that the property against which they are levied is benefited thereby to the extent of the levy, *and the municipality acts as an agent, merely, in collecting the tax.* The district improved is never coextensive with the county or city, and it is not true that in paying the assessment the county must raise money to pay over to itself, and that no one would be benefited but the officers employed in the collection of the tax. There is no reason why the county, the city, or the school district should not pay for the benefits received by it the same as any other property owner. *Of course, their property may not be sold, but there is no reason why the amount of the tax should not be paid out of the treasuries of these institutions; and, if*

*the governing bodies fail to make payment, mandamus
will lie to compel them to do so.''* (Italics mine.)

I think I am justified in assuming that, if instead of
a corporate levy against the city, the law had directed
a specific levy upon the streets and alleys and existing
sewers of the city, this court would, under the law as
announced in *In re Howard Avenue North, supra,* sus-
tain the assessment. But the distinction.is one of form
only, and not of substance.

Our laws authorize cities of the state to condemn
property in aid of public improvements, and provide
for the appointment of eminent domain commissioners,
whose duty it is to spread the cost of the condemnation
improvement upon benefited property, and levy a por-
tion of the expense in a proper case against the city
itself. Numerous cases arising under this law have
been before this court, and levies against the city sus-
tained—levies not made upon specifically benefited
property, but assessed against the city on account of
the general benefit derived.

Most of the cities of the state are now indebted in
excess of their limit, certainly in excess of the one and
one-half per cent allowable to their city councils, and
some were so indebted in the past when eminent do-
main assessments were levied against them. Will the
majority hold that all these assessments are illegal,
and the bonds issued against them void, as in excess
of the corporate debt limit?

I have read all the cases cited in the majority opin-
ion and do not find among them one which sustains it.
They all deal with cases where counties or other mu-
nicipalities had themselves incurred debt in excess of
the constitutional limit and sought to justify the in-
debtedness by the contention that it was incurred in
the performance of some mandatory governmental
function. In none of them is involved the question at

issue here. And it is interesting to note that nearly all of the cases cited are in direct conflict with the many cases from our own court subsequently cited in the majority opinion, to the effect that this court has long been committed to the doctrine that obligations of municipalities in performance of duties made mandatory by the constitution, or such obligations as are necessary to maintain corporate existence, are not debts within the constitutional limitation. Taking as an example the only case quoted by the majority, *Lake County v. Rollins,* 130 U. S. 662, 9 S. Ct. 651, we find the question involved was the legality of certain warrants for witness fees, jurors fees, election costs, charges for board of prisoners, etc., issued by the county in excess of its debt limit. The case held that the county was not authorized to issue warrants for these expenses in excess of its debt limit, and could not justify its attempt to do so by the claim that the warrants were issued in performance of compulsory governmental duties. The citation of *Lake County v. Rollins* is most inept, for, turning to *Rauch v. Chapman,* 16 Wash. 568, 48 Pac. 253, 58 Am. St. 52, 36 L. R. A. 407, we find the salutary doctrine of the case brushed aside, and a latitudinarian doctrine announced and followed to the present time. All of the decisions that have followed *Rauch v. Chapman* and broadened the principle there announced, have been in direct conflict with the *Lake County* case. *Rauch v. Chapman* and succeeding cases have fixed the law, and it is now too late to change it, but I am frank to say that it might have been a happy thing for the state if *Lake County v. Rollins* had been followed.

But, in any event, that case has nothing to do with the instant case. The constitution authorizes the legislature to form municipal corporations and to endow them with the necessary power to perform the func-

tions for which they are authorized, always subject, of course, to limitations imposed in the organic instrument itself.

In *Paine v. Port of Seattle*, 70 Wash. 294 (p. 320), 126 Pac. 628, 127 Pac. 580, it is said:

"But it seems to us equally plain that it was the purpose and intent of the constitution that one of these incorporations could be superimposed upon the territory of the other; that is to say, that a city or town could be superimposed upon the territory of a county, that a school district could be superimposed upon the territory of a county and city or town, and that another municipal corporation, or perhaps more than one, could be superimposed upon the territory of a county, a city or town, and a school district. As to the corporations specifically named, there is no question that each has its own limit of indebtedness under the constitution, nothwithstanding the imposition of such indebtedness may increase the gross indebtedness chargeable to the particular territory to a sum equal of each of the limitations taken separately. Now the 'other municipal corporation' named in the constitution stands on the same plane as these especially enumerated. The language is that 'No county, city, town, school district, or other municipal corporation shall for any purpose become indebted,' to an amount exceeding a certain limitation; and clearly such corporation, when properly and legally organized possesses the same powers as those previously named. This leads to the inevitable conclusion that it has its own limitation of indebtedness and is not affected by the indebtedness of the different municipalities having jurisdiction over the territory on which it is superimposed."

In *Comfort v. Tacoma*, 142 Wash. 249, 252 Pac. 929, the city of Tacoma had included in its tax levy a sum for the guaranty fund created under chapter 141, Laws of 1923, p. 454. This fund was established by the legislature to guarantee local improvement bonds issued

by the city and payable only by special assessments levied on benefited property. A taxpayer brought an action to set aside the levy made for this purpose. Several questions were raised. One of them was that the obligation assumed by the city through the guaranty fund and the levy of taxes for the fund was the assumption of a debt which, in the then financial condition of Tacoma, would exceed its debt limit. In the discussion of this contention, the court said:

"Nor will the amount, if any, which accrues each year by reason of the property-owners' failure to pay, become a debt of the city, as that term is used in construing the constitutional limitation, for provision is made therefor by tax levy. It is a well-recognized legal principle that those obligations which as soon as they become such, are provided for by taxation for the current year, are not to be included in the debts that are taken into consideration in determining the one and one-half per cent constitutional limit."

The contention of the respondent amounts simply to this: That, by its own voluntary act in the exhaustion of its debt limit for its own corporate needs, it has placed itself without the laws of the state and may shirk with impunity a public obligation imposed upon it by constituted authority. Under the law as announced in the majority opinion, a single city may thus block a public improvement vitally necessary to an extensive region. I do not think the constitution contemplates such an anomaly.

I can not escape the conclusion that the majority has misapprehended the basic principles underlying the present case, and is condoning the disregard of a public duty by the respondent city, with the resulting repudiation of bonds issued by the drainage district in exchange for the funds with which the improvement was made. This improvement was made and the bonds

purchased in reliance upon the good faith of all concerned, and upon principles of law long accepted.

I think the judgment of the trial court should be reversed.

